SUPERIOR COURT 
 
 NICOLE MACTAGGART AND OTHERS / GLENN WILDER AND OTHERS / IRENE RAY AND OTHERS / ANNE WEISS AND OTHERS / DIANNE L. DEPALMA AND OTHERS / BENJAMIN BROPHY AND OTHERS / ROBERT JOHNSON AND OTHERS / PATRICIA BECKETT AND OTHERS / MARY D. LOMBARDI

 
 Docket:
 2384CV01389-BLS2 / 2384CV01461-BLS2 / 2384CV01481-BLS2 / 2384CV01602-BLS2 / 2384CV01640-BLS2 / 2384CV01843-BLS2 / 2384CV02002-BLS2 / 2384CV02223-BLS2 / 2384CV02373-BLS2 / 2384CV02624-BLS2 / 2384CV02699-BLS2 / 2384CV02836-BLS2
 
 
 Dates:
 February 12, 2024
 
 
 Present:
 Kenneth W. Salinger
 
 
 County:
 SUFFOLK
 

 
 Keywords:
 DECISION AND ORDER ALLOWING MOTIONS TO DISMISS ALL CLAIMS AGAINST THE THREE HARVARD DEFENDANTS
 
 

 The former manager of the morgue at the Harvard Medical School (“HMS”) has been charged with committing Federal crimes by running a years-long scheme in which he marketed, stole, and sold body parts from human remains that had been donated for use in education or research.

The plaintiffs in these cases are close relatives of people who donated their bodies to HMS. They are understandably horrified that the physical remains of their loved ones may have been abused and desecrated after HMS completed its educational or research use of those remains. 

Most plaintiffs seek relief against Cedric Lodge, the former morgue manager. They all assert claims against the President & Fellows of Harvard College (“Harvard”), which is the legal name of Harvard University and includes HMS. And some plaintiffs also assert claims against two Harvard employees who ran the HMS Anatomical Gift Program (Mark Cicchetti and Tracey Fay).

The Court will allow the motions to dismiss all claims against Harvard, Cicchetti, and Fay, because the factual allegations in the complaints do not plausibly suggest that these Harvard Defendants failed to act in good faith in

-1-

receiving and handling the donated bodies, or that they are legally responsible for Mr. Lodge’s alleged misconduct. The plaintiffs have therefore not met their burden of making factual allegations that, if true, could overcome the Harvard Defendants’ qualified immunity under the Massachusetts version of the Uniform Anatomical Gift Act. Though the appalling things that Lodge allegedly did are not protected by this immunity statute, the allegations in the complaints make clear that Harvard, Cicchetti, and Fay are not vicariously liable for Lodge’s actions—which means that the allegations about what Lodge did cannot defeat the Harvard Defendants’ qualified immunity.

The Court will order that separate and final judgments shall enter dismissing all claims against Harvard, Cicchetti, and Fay with prejudice. That will give plaintiffs the right to appeal this decision immediately, without waiting for resolution of their separate claims against Lodge.

1. Procedural Background. Forty-seven plaintiffs brought these twelve lawsuits, all arising from the same alleged misconduct by Mr. Lodge. Many of the plaintiffs seek to represent classes of hundreds of people whose relatives’ remains may have had parts cut out and sold as merchandise in this macabre and sacrilegious scheme.

As noted above, all the complaints in these cases assert claims against Harvard. Four of them also assert claims against Cicchetti and Fay. All but two of the complaints assert claims against Lodge.[1]

The claims against Harvard fall into several categories. All plaintiffs have sued Harvard for negligence; they sometimes break their negligence allegations into two or three separate counts, including negligent infliction of emotional distress or negligent supervision. The various complaints also include eight claims against Harvard for wrongful interference with a corpse, seven “respondeat superior” claims seeking to hold Harvard vicariously liable for Lodge’s misconduct, two similar claims seeking to hold Harvard liable for alleged misconduct by Cicchetti and Fay, three claims for breach of contract,

--------------------------------------------

[1] In addition, five of the complaints assert claims against the Carl J. Shapiro Institute for Education and research at Harvard Medical School and Beth Israel Deaconess Medical Center, Inc. The Casadonte plaintiffs have dismissed their claims against the Shapiro Institute with prejudice. The Court understands that the other plaintiffs who have asserted claims against the Shapiro Institute are exploring whether they should also drop those claims.

-2-

one claim for unjust enrichment, two claims for intentional infliction of emotional distress, and four claims seeking injunctive or declaratory relief.

The four actions that name Cicchetti and Fay as defendants all allege that Cicchetti and Fay were negligent. Two of these actions claim that Cicchetti and Fay are liable for breach of fiduciary duty, and one of them asserts claims against them for interference with a corpse.

At the request of all Plaintiffs’ counsel, the court (Ricciuti, J.) consolidated these actions for all pre-trial purposes. The consolidation order designates two lawyers to serve as plaintiffs’ co-lead counsel, a third lawyer to serve as plaintiffs’ liaison counsel to handle administrative matters and coordinate communications, and seven other lawyers to serve on a steering committee.

The three Harvard Defendants served and filed motions to dismiss all claims against them, supported by a single, consolidated memorandum of law. In turn, the plaintiffs filed a single, consolidated written opposition to the motions to dismiss. The parties all agreed to this procedure.[2] The Court heard oral argument on the motions to dismiss on January 19, 2024.

2. Factual Allegations. The core factual allegations in the twelve complaints can be summarized as follows. Plaintiffs descriptions of the alleged misconduct by Cedric Lodge come from the Federal grand jury indictment in United States v. Cedric Lodge et al., No. 4:23-CR-159 (U.S.D.C. D. Penn.).

The Harvard Medical School accepts gifts of human bodies for use as teaching tools to help medical students learn human anatomy. Harvard refers to this as its Anatomical Gift Program. When someone donates their own body or a relative’s body to HMS, they specify what should happen when the educational use of the body is complete, including whether HMS should cremate the remains and whether it should return the body or cremated ashes to the family.

--------------------------------------------

[2] The last of these consolidated civil actions, filed by Riccardo Servizio and  others, was filed after the Harvard Defendants had served their motions to dismiss and consolidated memorandum in support. The Servizio plaintiffs filed a motion to consolidate their action with the other cases concerning the HMS morgue. As part of that motion, these plaintiffs agreed to join in the consolidated briefing about the issues raised in the motions to dismiss, and to be bound by the Court’s decision without the Harvard Defendants having to file a separate motion to dismiss their action. The Court allowed the Servizio plaintiffs’ motion on December 29, 2023.

-2-

HMS stores donated bodies in its onsite morgue, both before the bodies are used for educational purposes, and again after the educational use of the body is complete and the remains are awaiting final disposition.

Mr. Lodge worked for HMS from 1995 through 2023. At some point he became manager of the HMS morgue.

Lodge and others (all from outside of Harvard) entered into and carried out a conspiracy to steal and sell body parts and tissue from human bodies that had been donated to HMS for educational use. As part of this scheme, Lodge repeatedly brought unauthorized people into the HMS morgue to view donated bodies and select parts that they wished to purchase. Lodge would cut out and take away the selected body parts, so that he and his wife could sell and sometimes ship them to customers. Lodge engaged in this scheme from at least 2018 until early 2023.

Harvard contends, and for the purpose of the motions to dismiss plaintiffs appear to accept, that Lodge would steal parts of bodies that had been sent back to the morgue after their educational use was complete, and before the body was sent out for cremation or other final disposition. Mark Cicchetti was the Managing Director and Tracey Fay was the Manager of the Anatomical Gift Program at HMS during the time that Lodge was allegedly stealing and selling body parts from the HMS morgue.

The Federal indictment against Lodge was filed on June 13, 2023. The indictment alleges that “[e]mployees of Harvard Medical School are not permitted to remove, keep, or sell any human remains,” and that Lodge “stole dissected portions of human cadavers … without the knowledge or permission of HMS.”[3] Though the allegations in the Federal indictment against Lodge are not dispositive here, the plaintiffs’ complaints do not contain any factual allegations plausibly suggesting that HMS employees are allowed to remove, keep, or sell human body parts, or that HMS knew what Lodge was doing, or that HMS gave Lodge permission to do so.

--------------------------------------------

[3] The Court may consider the contents of the Federal indictment against Lodge because it is a matter of public record and the plaintiffs used the allegations in that indictment in framing their complaints. See, e.g., Schaer v. Brandeis Univ., 432 Mass. 474, 477 (2000) (“matters of public record”); Ryan v. Mary Ann Morse Healthcare Corp., 612, 614 n.5 (2019) (documents that plaintiff was on notice of and used in framing complaint).

-4-

After the indictment was filed, HMS sent letters to known family members of people whose bodies had been donated to HMS, informed them of Lodge’s indictment, and let them know (based on HMS records) whether their loved one’s remains were “potentially impacted” or “not believed to be impacted” by Lodge’s misconduct.

3. Legal Background. The procedural rule and statutory provisions summarized below inform the Court’s decision on the Harvard Defendants’ motions to dismiss.

3.1. Dismissal under Rule 12(b)(6). Defendants in a civil action may seek dismissal of the claims against them on the ground that the complaint fails “to state a claim upon which relief can be granted.” Mass. R. Civ. P. 12(b)(6). To survive a motion to dismiss under Rule 12(b)(6), a complaint must allege facts that, if true, would “plausibly suggest[] … an entitlement to relief.” Lopez v. Commonwealth, 463 Mass. 696, 701 (2012), quoting Iannacchino v. Ford Motor Co., 451 Mass. 623, 636 (2008), and Bell Atl. Corp. v. Twombly, 550 U.S. 544, 557 (2007). 

In deciding a motion to dismiss under Rule 12(b)(6), the Court must assume that the factual allegations in the plaintiffs’ complaints, and any reasonable inferences that may be drawn from the facts alleged, are true. See Golchin v. Liberty Mut. Ins. Co., 460 Mass. 222, 223 (2011). However, it must “look beyond the conclusory allegations in the complaint and focus on whether the factual allegations plausibly suggest an entitlement to relief.” Maling v. Finnegan, Henderson, Farabow, Garrett & Dunner, LLP, 473  Mass. 336, 339 (2015), quoting Curtis v. Herb Chambers I–95, Inc., 458 Mass. 674, 676 (2011).

“The purpose of rule 12(b)(6) is to permit prompt resolution of a case where the allegations in the complaint clearly demonstrate that the plaintiff’s claim is legally insufficient.” Harvard Crimson, Inc. v. President and Fellows of Harvard Coll., 445 Mass. 745, 748 (2006). Where a complaint sets out “detailed factual allegations which the plaintiff contends entitle him to relief,” a claim must be dismissed if those allegations “clearly demonstrate that plaintiff does not have a claim.” Fabrizio v. City of Quincy, 9 Mass. App. Ct. 733, 734 (1980).

3.2. Uniform Anatomical Gift Act. In 1971, the Massachusetts Legislature adopted the original Uniform Anatomical Gift Act (the “UAGA”) to govern the donation of human bodies and body parts. See St. 1971, c. 653 (enacting G.L. c. 113, §§ 7–13). The UAGA was drafted and approved by the National Conference of Commissioners on Uniform State Laws in 1968. Carey v. New England Organ Bank, 446 Mass. 270, 272 (2006).

-5-

The Legislature adopted a revised version of the UAGA in 2012. See G.L. c. 113A, §§ 1–25; St. 2012, c. 39, § 3 (adopting c. 113A). This statute authorizes and governs donations “of all or part of a human body to take place after the donor’s death for the purpose of transplantation, therapy, research or education.” See G.L. c. 113A, § 1 (definition of “anatomical gift”) and §§ 4–11 (authorizing the making and receipt of anatomical gifts).

People who wish to donate their body or designated organs or tissues for lawful purposes may do so, while they are still alive, with the gift to take effect once they have died. See G.L. c. 113A, §§ 4–5. Anyone who does so may amend or revoke their gift at any time. Id. § 6.

People may also make clear that they do not want to donate their body or any part of it by saying so in their will, in another record, or in a communication to at least two adults while the person is suffering from a terminal illness or injury. G.L. c. 113A, § 7. An unrevoked refusal to make an anatomical gift will bar relatives from doing so after the person dies. Id. § 7(d).

If a person dies without making or refusing to make an anatomical gift, their close relatives or others with authority may choose to make an anatomical gift of the person’s body or parts of their body, once again only “for transplantation, therapy, research, or education.” G.L. c. 113A, § 9.

The UAGA authorizes three different kinds of anatomical gifts. First, medical schools, hospitals, and other appropriate entities may accept such gifts “for research or education.” See G.L. c. 113A, § 11(a)(1). This is the kind of gift at issue in this case, which involves donation of human bodies for use in teaching medical students and others. Second, a donor may give a specific body part for transplantation to a designated individual recipient. Id. § 11(a)(2). Third, a donor may make an anatomical gift to an eye bank or a tissue bank for transplantation, therapy, research, education, or a combination of those purposes. Id. § 11(a)(3) & (d).

As discussed below, the UAGA provides that anyone who acts in accordance with this statute, “or who attempts in good faith to do so,” shall be immune from suit or prosecution. See G.L. c. 113A, § 18(a).

The Legislature has directed that, “[i]n applying and construing this chapter,” courts should try to promote uniformity of the law with respect to anatomical gifts “among states that have the uniform act or a similar law.” Id. § 24. Case law applying the UAGA in other jurisdictions therefore provides useful

-6-

guidance in how to apply this uniform statute in Massachusetts. See, e.g., Carey, 446 Mass. at 282–283.

4. Analysis. The Harvard Defendants are entitled to dismissal of all claims against them because (1) those claims are barred by the UAGA grant of qualified statutory immunity so long as the Harvard Defendants made a good faith attempt to comply with the requirements of the UAGA, (2) the facts alleged in plaintiffs’ complaints do not plausibly suggest that any of the Harvard Defendants failed to act in good faith, and (3) the facts alleged also make clear that the Harvard Defendants are not vicariously liable for the alleged misconduct of the former manager of the HMS morgue, and thus cannot lose their qualified immunity based on his bad acts.

4.1. Scope of the UAGA Qualified Immunity Provision. The Harvard Defendants are immune from suit over their handling of donated human bodies so long as they complied with the requirements of the Uniform Anatomical Gift Act or made a good faith attempt to do so. The UAGA immunity provision says that:

A person who acts in accordance with this chapter … or who attempts in good faith to do so, shall not be liable for the act in a civil action, criminal prosecution or administrative proceeding.

G.L. c. 113A, § 18(a).

This UAGA section “provides immunity from suit, not simply a defense to liability.” Rahman v. Mayo Clinic, 578 N.W.2d 802, 805 (Minn. Ct. App. 1998) (affirming summary judgment); accord Scarbrough v. Transplant Resource Center of Maryland, 215 A.3d 436, 438 & 472 (Md. Ct. Spec. App. 2019) (affirming dismissal for failure to state a viable claim); Seamans v. Harris County Hosp. Dist., 934 S.W.2d 393, 396 (Tex. App. 1996) (affirming summary judgment).

4.1.1. The Immunity Statute Covers Storage of Donated Bodies. The immunity provision is not limited to “the transactional aspects” of the anatomical gift process, as plaintiffs contend. It also protects recipients of such gifts against claims that they misused or improperly stored, handled, or disposed of a donated body or body part.

The recipient of a donated human body or other anatomical gift “acts in accordance with” the UAGA, within the meaning of the qualified immunity provision in § 18(a), where they use the gift for a lawful purpose designated by the donor—meaning either for research or education (as in this case), for transplantation into the body of a designated recipient, or for transplantation,

-7-

therapy, research, or education by or through an eye bank or tissue bank. G.L. c. 113A, § 11(a)(1)–(3). If the gift is of an entire body (rather than, say, of particular organs or tissue for use in transplantation or therapy), then the recipient of the body must also ensure that the remains are properly and respectfully interred or disposed of by burial or cremation when the body will no longer be used for research or education. G.L. c. 113A, § 14(h).

“The UAGA was intended, among other things, to ‘encourage the making of anatomical gifts’ by eliminating uncertainty as to the legal liability of those authorizing and receiving anatomical gifts” (emphasis added). Carey, 446 Mass. at 272, quoting Prefatory Note to UAGA (1968), 8A U.L.A. 71 (Master ed. 2003). As the Comments to the original uniform act explained, the immunity provision was considered to be “essential if the medical profession is to be able to accept anatomical gifts freely and without fear of legal proceedings.”[4] That is why “the language of the good immunity provision is very broad” in scope; it protects all good faith efforts by a recipient of an anatomical gift to use the donated body or body part as intended, including storage, preservation, transportation, and disposal. See Scarbrough, 215 A.3d at 464–465.

In Scarbrough, for example, the court rejected the argument that the UAGA “provide[s] immunity only for those who remove [an] organ from a donor’s body or where consent is in dispute.” Id. at 457. It held that the statute also protects from suit “post-removal activities of an organ procurement organization in packaging, preserving, and transporting an organ intended for transplant to the recipient hospital,” explaining that those activities are “an integral  part of  the donation and recovery process that the Act covers.”  Id.  at 462 (affirming dismissal for failure to state a viable claim).

In a case like this, concerning the donation of entire human bodies for use in education or research, the storage and ultimate disposal of the body when it will no longer be used for those purposes are also integral parts of the donation and receipt process that the UAGA authorizes and covers. These activities are therefore covered by the qualified immunity provision.

Carey confirms that the UAGA immunity provision is broad in scope. In that case, the defendant organ bank was immune from liability for allegedly harvesting blood vessels, corneas, and a skin graft without consent, and for incorrectly telling family members that the harvested had been or would be transplanted when in fact they could not be. See 446 Mass. at 276. These claims

--------------------------------------------

[4] Ex. A to the Harvard Defendants’ reply memorandum, at 17.

-8-

were barred by the statutory immunity provision because the plaintiffs could not meet their burden of showing that the organ bank had failed to act in good faith. Id. at 282–284 (affirming summary judgment).

Courts in other jurisdictions have similarly held that the UAGA immunity provision protects institutions against suits that they have misused or improperly disposed of anatomical gifts. See Favaloro v. President and Fellows of Harvard College, no. 07-1187 (1st Cir. June 12, 2007) (affirming dismissal of claim against Harvard Medical School for sending donated bodies to crematory that allegedly mishandled the remains) ; Rahman, 578 N.W.2d at 806 (Minn. Ct. App. 1998) (clinic immune from suit where it acted in good faith to use body parts for educational purposes, as donation form said only “no research”); see also Kennedy-McInnis v. Biomedical Tissue Services, Ltd., 178 F.Supp.3d 97, 107–108 (W.D.N.Y. 2016) (tissue bank held immune because it purchased human tissue in good faith, without realizing that consent forms provided by funeral home and human-tissue recovery firm that sold the tissue were fraudulent); Siegel v. LifeCenter Organ Donor Network, 969 N.E.2d 1271, 1279 (Ohio Ct. App. 2011) (eye bank that harvested eyes entitled to good faith immunity); Andrews v. Alabama Eye Bank, 727 So.2d 62, 64–66 (Ala. 1999) (same); Lyon v. United States, 843 F.Supp. 531, 534 (D. Minn. 1994) (same); Nicoletta v. Rochester Eye and Human Parts Bank, Inc., 519 N.Y.S.2d 928, 932–933 (N.Y. Supr. Ct. 1987) (same); Kelly- Nevils v. Detroit Rec’g Hosp., 526 N.W.2d 15, 17 (Mich. Ct. App. 1994) (hospital that harvested organs entitled to good faith immunity).

In sum, the Harvard Defendants are immune from suit so long as they acted in good faith in attempting to ensure that human bodies donated to the HSM for use in medical education were treated with respect and properly disposed of when no longer needed for educational or research purposes.

4.1.2. Immunity for Good Faith Conduct, Even if Negligent. The insertion of the “good faith” clause G.L. c. 113A, § 18(a), means that the recipient of a donated body or other anatomical gift is immune from liability if they make a “good faith” attempt to comply with the UAGA, whether the attempt is “successful or not.” Carey, 446 Mass. at 278 n.15. For an attempt to comply with the UAGA to be in “good faith,” it must reflect “an honest belief, the absence

-9-

of malice, or the absence of a design to defraud or to seek an unconscionable advantage over another.” Id. at 282.[5]

It follows that a plaintiff cannot overcome the qualified immunity of someone who received a lawful anatomical gift by showing that the recipient was negligent in handling the gift, because a showing of negligence would not demonstrate an absence of good faith. See Berk v. Kronlund, 102 Mass. App. Ct. 710, 711, 716–718 (2023) (allegations that physician negligently referred colleague to peer review committee on suspicion of abusing opioids did not defeat defendant’s statutory qualified immunity for making such reports in good faith). Where someone enjoys qualified immunity so long as they acted in good faith, as under the UAGA, they cannot be held “liable for negligence or other error.” See Nelson v. Salem State College, 446 Mass. 525, 537 (2006); see also Sattler v. Northwest Tissue Center, 42 P.3d 440, 444 (Wash. Ct. App. 2002) (“[a] negligence standard is not used to determine whether good faith immunity will attach” under the UAGA).

It may not seem fair that Harvard can avoid responsibility and liability in this case even if, as plaintiffs allege, it was negligent in overseeing the HMS morgue and as a result let Lodge get away with stealing body parts for years. But the Court must follow the clear command of the UAGA immunity provision. Like all statutes, this immunity provision implements a legislative policy judgment that the Court must enforce without questioning whether it is wise, effective, or sound policy. Cf. Lowery v. Klemm, 446 Mass. 572, 581 (2006) (“wise or effective”); Decker v. Black & Decker Mfg. Co., 389 Mass. 35, 43 (1983) (“wise or sound policy”). When courts enforce a statute, they “do not decide what the Legislature should have done, but rather … must implement what it has chosen to do.” Kobrin v. Gastfriend, 443 Mass. 327, 338 n.13 (2005).

4.2. The Facts Alleged Do Not Suggest Lack of Good Faith. The plaintiffs’ claims against the Harvard Defendants must be dismissed because the allegations in plaintiffs’ complaints do not plausibly suggest that any of the

--------------------------------------------

[5]   Though the 2012 amendments to the UAGA rewrote the immunity provision  to cover good faith attempts to comply with the statute, this only made explicit what was implied by the previous version of the statute; it did not substantively expand the scope of the immunity provision. See Carey, 446 Mass. at 278 n.15 (this UAGA revision, which the Massachusetts Legislature had not adopted as of 2006, “makes express what is implied by [the prior version of] this section, that a good faith attempt to comply with the statute, whether successful or not, provides a defense to liability”).

-10-

Harvard Defendants failed to act in good faith in their handling of human bodies that were donated to the HMS for use in education or research.

A plaintiff suing the recipient of an anatomical gift, donated in accord with the UAGA, bears the burden of proving that the statutory immunity provision does not apply because the defendant did not act in good faith. See Carey, 446 Mass. at 282–283. This is consistent with the general rule that, where a statute creates a qualified immunity from suit, “the burden of overcoming the immunity rests exclusively with the plaintiff.” Berk, 102 Mass. App. Ct. at 717 (immunity for good faith communication with medical peer review committee), quoting Maxwell v. AIG Dom. Claims, Inc., 460 Mass. 91, 104 (2011) (immunity for good faith report of suspected workers’ compensation fraud).

It follows that a plaintiff who brings suit against the recipient of an anatomical gift must allege facts plausibly suggesting that the defendant did not act in good faith, or face dismissal of their complaint under Mass. R. Civ. P. 12(b)(6).

Where a defendant is immune from suit or liability so long as they acted in good faith, a claim must be dismissed if the complaint fails to allege facts plausibly suggesting that the defendant acted in bad faith. See, e.g., Harhen v. Brown, 431 Mass. 838, 839, 847–848 (2000) (since business judgment rule protects disinterested corporate directors who act in good faith in refusing to bring suit on behalf of corporation, claim challenging that decision must be dismissed where complaint alleges no facts suggesting bad faith); Matter of Colecchia Family Irrevocable Trust, 100 Mass. App. Ct. 504, 521 (2021) (since trustee was immune from liability for not following prudent investor rule so long as they acted in good faith, breach of fiduciary duty claim was properly dismissed where complaint did not allege bad faith).

This principle applies with full force here. Where the recipient of an anatomical gift is sued for alleged negligence or other misconduct that is covered by the UAGA immunity provision, the claims must be dismissed if the complaint fails to allege facts plausibly suggesting that the defendant did not act in good faith. E.g., Favaloro, no. 07-1187 (1st Cir.) (Harvard Medical School sued for sending donated bodies to crematory that allegedly mishandled the remains; affirming dismissal); accord Tune v. Donor Network of Arizona, 2020 WL 5638532, at * 3 (Ariz. Ct. App.) (organ procurement organization sued for harvesting corneas; affirming dismissal); Scarbrough, 215 A.3d at 447–448 (Md. Ct. Spec. App.) (organ procurement organization sued for harvesting kidney; affirming dismissal); Kelly-Nevils, 526 N.W.2d at 17–21 (Mich. Ct. App.) (hospital sued for harvesting organs; affirming summary disposition before discovery).

-11-

Plaintiffs would have the burden of pleading facts sufficient to show that the UAGA immunity provision does not apply even if invocation of the statutory qualified immunity was an affirmative defense. If the facts alleged in a complaint show that there is a dispositive affirmative defense, as in this case, then “the complaint does not state a claim upon which relief can be granted” and dismissal under Rule 12(b)(6) is appropriate. See Cavanaugh v. Cavanaugh, 396 Mass. 836, 838 (1986) (res judicata); accord, e.g., Longval v. Commissioner of Correction, 448 Mass. 412, 413 & 418–424 (2007) (qualified immunity from suit under 42 U.S.C. § 1983); Epstein v. Seigel, 396 Mass. 278, 279 (1985) (statute of limitations); Padmanabhan v. City of Cambridge, 99 Mass. App. Ct. 332, 338–342 (2021) (quasi-judicial absolute immunity); State Room, Inc. v. MA-60 State Associates, L.L.C., 84 Mass. App. Ct. 244, 248–252 (2013) (unreviewability of appraisal of fair market rental value); Rozene v. Sverid, 4 Mass. App. Ct. 461, 463–464 (1976) (statute of frauds).

Nothing alleged by the plaintiffs in their complaints suggests that Harvard, Cicchetti, or Fay failed at any time to act in good faith. The complaints do not allege that HMS employees were allowed to remove, keep, or sell human body parts, that any of the Harvard Defendants knew what Lodge was doing, or that any of the Harvard Defendants gave Lodge permission to do so.

Though some of the complaints allege that Harvard “knew or should have known” what Lodge was doing, that is not sufficient to overcome Harvard’s qualified immunity at the pleading stage. Conclusory and unexplained allegations that Harvard “knew” what Lodge was up to are not entitled to any weight in deciding whether the complaints should be dismissed under Rule 12(b)(6). See, e.g., Maling, 473 Mass. at 339 (2015). The further allegation that Harvard “should have known” about Lodge’s ongoing scheme is also insufficient because, if true, it would show only that Harvard was negligent, not that it failed to act in good faith. See generally Tobin v. Norwood Country Club, Inc., 422 Mass. 126, 141 (1996) (liability for “negligence is based on reasonable foreseeability of harm,” considering what defendant “knew or should have known,” as well as “the availability of reasonable measures to avoid that harm, and the failure to take those measures”).

Plaintiffs’ argument that they should be allowed to conduct discovery to see whether they may unearth evidence of bad faith is without merit. A civil plaintiff is required to state a viable claim before they may engage in discovery about it. “Discovery cannot be used as a vehicle for discovering a right of action.” See E.A. Miller, Inc. v. South Shore Bank, 405 Mass. 95, 100 (1989),

-12-

quoting MacKnight v. Leonard Morse Hosp., 828 F.2d 48, 51 (1st Cir. 1987), and  4 Moore’s Federal Practice ¶ 26.56[1], at 26-95 n.3 (1987).

4.3. Lodge’s Misconduct Not Attributable to Harvard Defendants. The main thrust of Plaintiffs’ arguments is that the nauseating misconduct allegedly undertaken by Cedric Lodge could not possibly constitute a good faith attempt to comply with the UAGA requirement that bodies donated for use in medical education, when no longer needed for that purpose, must be properly and respectfully interred or disposed of by burial or cremation. Cf. G.L. c. 113A, § 14(h). Plaintiffs point out that the UAGA immunity section in no way immunizes medical institutions for illegally displaying, dismembering, and selling parts of donated bodies, as Lodge has been charged with doing.

Those arguments are correct, but beside the point.

They are not relevant to the claims against the Harvard Defendants because the facts alleged in the complaints do not plausibly suggest that Harvard, Cicchetti, or Fay engaged in any such conduct, or that they can be held liable based on Lodge’s conduct. Plaintiffs allege that Lodge committed all of these bad acts, but the factual allegations in the complaints make clear that Lodge was acting outside the scope of his employment by Harvard when he did so. The facts alleged also make clear that Cicchetti and Fay could not be held vicariously liable for the additional reason that they had no employment or other agency relationship with Lodge. 

4.3.1. Plaintiffs Must Show Vicarious Liability. To overcome the Harvard Defendants’ qualified immunity against claims that they improperly stored or disposed of donated human bodies, the plaintiffs must be able to allege and later prove that Harvard, Cicchetti, and Fay did not comply with the UAGA and did not make good faith efforts to do so. G.L. c. 113A, § 18(a).

Misconduct by someone else (such as Lodge) would not deprive the Harvard Defendants of their qualified immunity unless they were legally responsible for that other person’s bad acts. Let’s imagine a different case, in which an unauthorized stranger broke into a medical school’s morgue, stole parts from several bodies, and later sold those body parts. And let’s imagine that this stranger was not known to, not an employee of, and not any other kind of agent for the medical school. In this hypothetical case, the medical school could not be sued and held liable for the conduct by the stranger. As a result, so long as the medical school’s own conduct was undertaken in good faith, under the UAGA the school would be immune from suit on a theory that it had

-13-

negligently failed to prevent the stranger from committing crimes within the school’s morgue.

Now, an organization like Harvard may be legally responsible for injury or harm caused by its employee or other agent, so long as that person was acting within the scope of their employment or agency at the time. Under those circumstances, the conduct by the employee is “imputed” to the employer or principal; this means that the employer or principal shares legal liability for that negligence or other misconduct. See generally Merrimack College v. KPMG LLP, 480 Mass. 614, 620 (2018). This is a type of “vicarious” or indirect liability; it is sometimes described using the Latin phrase “respondeat superior.”[6] See Lev v. Beverly Enterprises-Massachusetts, Inc., 457 Mass. 234, 238 (2010).

“Broadly speaking, [the doctrine of] respondeat superior is the proposition that an employer, or master, should be held vicariously liable for the torts of its employee, or servant, committed within the scope of employment.” Dias v. Brigham Med. Assocs., Inc., 438 Mass. 317, 319–320 (2002). Similarly, where a principal authorizes some other kind of agent to act on its behalf, or appears to do so, the principal can be held vicariously liable for misconduct by the agent while apparently acting within the scope of their authority. See Kansallis Finance Ltd. v. Fern, 421 Mass. 659, 665–669 (1996).

But there can be no vicarious liability where there is no employment relationship and no other actual or apparent agent relationship, which is why Harvard could not lose its qualified immunity based on misconduct by a stranger. See, e.g., Sandman v. Quincy Mut. Fire Ins. Co., 81 Mass. App. Ct. 188, 191–193, rev. denied, 461 Mass. 1110 (2012) (affirming dismissal because insurer not vicariously liable for misrepresentations by attorney retained to represent insured, without allegation that attorney had employment relationship with insurer); Lind v. Domino’s Pizza LLC, 87 Mass. App. Ct. 650, 654–659 (2015) (affirming summary judgment because franchisor not vicariously liable for misconduct by franchisee, where there was no agency relationship because franchisor did not control or have right to control franchisee’s specific policy or practice that caused harm).

These common law limitations on holding an organization or an individual liability for someone else’s misconduct were well established when the Legislature amended the UAGA. We must therefore presume that the

--------------------------------------------

[6] “Respondeat superior ” is often translated as “let the master answer.” See Respondeat Superior, Black's Law Dictionary (10th ed. 2014).

-14-

Legislature understood these principles when it adopted the current UAGA immunity provision. Cf. Commonwealth v. J.F., 491 Mass. 824, 836 (2023) (“In interpreting a statute, we presume that when the Legislature enacts a law it is aware of the statutory and common law that governed the matter in which it legislates.”) (quoting Globe Newspaper Co., petitioner, 461 Mass. 113, 117 (2011)).

The Legislature provided that “a person who acts in accordance with” the UAGA “or who attempts in good faith to do so … shall not be liable for the act in a civil action” see G.L. c. 113A, § 18(a), but did not define the scope of acts that may be attributed to a potential defendant in determining whether those acts were undertaken as part of a good faith attempt to comply with the UAGA. Since the concept of limiting the circumstances in which one person or entity may be held vicariously liable for the acts of another finds “long-standing support in the common law,” we must presume that the UAGA immunity provision includes the same concept. See Jinks v. Credico (USA) LLC, 488 Mass. 691, 700–701 (2021) (undefined statutory term “employer” presumed to include common law concept of “joint employment”).

4.3.2. Harvard Is Not Vicariously Liable. Thus, the only way that the plaintiffs could use Lodge’s criminal conduct to overcome Harvard’s qualified immunity would be to show that Lodge was acting within the scope of his employment at the HMS, and that Harvard may therefore be held liable for Lodge’s actions in selling body parts that he stole from donated bodies awaiting proper disposal in the HMS morgue.

The allegations in the plaintiffs’ complaints make clear, however, that Lodge’s wrongdoing was not within the scope of his employment and therefore may not be imputed to Harvard. 

An employee’s conduct is deemed to be within the scope of their employment only “if it is of the kind he [or she] is employed to perform, … if it occurs substantially within the authorized time and space limits, … and if it is motivated, at least in part, by a purpose to serve the employer” (citations omitted). Lev, 457 Mass. at 238, quoting Wang Laboratories, Inc. v. Business Incentives, Inc., 398 Mass. 854, 859 (1986).

Under the last part of this test, if “an employee ‘acts from purely personal motives … in no way connected with the employer’s interests,’ he is not acting within the scope of his employment” and the employer is not vicariously liable for their actions. Timpson v. Transamerica Ins. Co., 41 Mass. App. Ct. 344, 348 (1996) (professional football player’s conduct encouraging others who were

-15-

sexually harassing female reporter in locker room served purely personal motives, and were thus outside scope of employment), quoting Pinshaw v. Metropolitan Dist. Comm'n, 402 Mass. 687, 694–695 (1988).

For example, if a store manager sexually assaults and rapes an employee in the workplace, the store cannot be held vicariously liable. See Doe v. Purity Supreme, Inc., 422 Mass. 563, 568 (1996). Since “rape and sexual assault of an employee do not serve the interests of the employer,” and could not possibly have been “motivated by a purpose to serve the employer,” the store manager’s actions in Purity Supreme were outside the scope of their employment, and thus the employer could not be vicariously liable for false imprisonment. Id. (affirming grant of summary judgment).

Similarly, if a bank’s customer account representative uses their position to steal money from a customer’s accounts over a period of years, the bank cannot be held vicariously liable. See Schlichte v. Granite Savings Bank, 40 Mass. App. Ct. 179, 181–182 (1996) (affirming grant of summary judgment). The employee’s withdrawal of money “for her own purposes” in Schlichte was “neither part of her job nor intended in any respect to benefit the bank;” the bank was therefore not vicariously liable for the employer’s wrongdoing. Id.

Though Timpson, Purity Supreme, and Schlichte were decided on motions for summary judgment, claims based on a theory of vicarious liability must be dismissed on a Rule 12(b)(6) motion where the allegations in the complaint do not plausibly suggest that the employer or other defendant may be held vicariously  liable  for  a  third-party’s  alleged  wrongdoing.  See   Sandman, 81 Mass. App. Ct. at 190–193.

In these cases, the plaintiffs’ factual allegations do not plausibly suggest that that Lodge’s actions in marketing, stealing, and selling human body parts were motivated, even in small part, by a purpose to serve the interests of HMS.    To the contrary, Lodge’s horrifying scheme was allegedly undertaken for purely personal gain, and could not possibly have been of any benefit to HMS or furthered the interests of HMS in any way. Plaintiffs therefore may not rely upon Lodge’s alleged misconduct to defeat Harvard’s qualified immunity.

4.3.3. Cicchetti and Fay Are Not Vicariously Liable. Nor do the factual allegations in the complaints plausibly suggest that Cicchetti or Fay may be held personally responsible for Lodge’s wrongdoing and as a result lose their qualified immunity. As discussed above, there can be no vicarious liability where there is no employment relationship and no other actual or apparent

-16-

agent relationship. See Sandman, 81 Mass. App. Ct. at 191–193; Lind, 87 Mass. App. Ct. at 654–659.

Plaintiffs make no allegations suggesting that Lodge was ever employed by or served as an agent for Cicchetti or Fay. Lodge worked for HMS, not for any person who supervised the HMS anatomical gift program. For that reason alone, the complaints do not suggest that Cicchetti or Fay may be held vicariously liable for Lodge’s bad acts, which means that the allegations about Lodge’s scheme cannot defeat Cicchetti’s or Fay’s qualified immunity.

5. Separate and Final Judgment. Although this decision resolves only the claims against the three Harvard Defendants, and not the claims against Lodge or the Shapiro Institute, the Court finds that there is no just reason for delaying the entry of judgment in the Harvard Defendants’ favor on all claims asserted against them. Doing so is fair and appropriate because it will allow the plaintiffs to appeal the Court’s ruling as of right without delay, and without waiting for the claims against the other defendants to be resolved. The statutory immunity issues appear to be unique to the Harvard Defendants, and seem unlikely to arise with respect to the other, remaining defendants. For these reasons, the Court will order that separate and final judgment in favor of the Harvard Defendants shall enter forthwith in all of the consolidated cases. Cf. Mass. R. Civ. P. 54(b).

ORDERS
The consolidated motion to dismiss all claims against the President & Fellows of Harvard College, Mark F. Cicchetti, and Tracey Fay is allowed.

Separate and final judgment shall enter in the civil actions brought by Nicole McTaggart and others (civil action 2384CV01389-BLS2), Glenn Wilder and others (civil action 2384CV01461-BLS2), Patricia Beckett and others (civil action 2384V02223-BLS2), and Mary D. Lombardi (civil action 2384CV02373-BLS2) stating that the claims against the President & Fellows of Harvard College, Mark F. Cicchetti, and Tracey Fay are dismissed with prejudice and that the plaintiffs shall take nothing against any of those three defendants.

Separate and final judgment shall also enter in the civil actions brought by Irene Ray and others (civil action 2384CV01481-BLS2), Anne Weiss and others (civil action 2384CV01602-BLS2), Dianne L. DePalma and others (civil action 2384CV01640-BLS2), Benjamin Brophy and others (civil action 2384CV01843- BLS2), Robert Johnson and others (civil action 2384CV02002-BLS2), Linda Casadonte and others (civil action 2384CV02624-BLS2), Spencer Newton and

-17-

others (civil action 2384CV02699-BLS), and Riccardo Servizio and others (civil action 2384CV02386-BLS2) stating that the claims against the President & Fellows of Harvard College are dismissed with prejudice and that the plaintiffs shall take nothing against that defendant.

/s/Kenneth W. Salinger
Justice of the Superior Court

February 12, 2024